# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| **ALONZO DWAYNE COLEMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | No. 1:13-CV-61 SNLJ |
| | ) | |
| | ) | |
| **MICHAEL HAKALA, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM and ORDER

Plaintiff Alonzo Coleman is an inmate suffering from progressive kidney and liver diseases that are ultimately lethal and for which there is no cure. He brought this 42 U.S.C. § 1983 action against defendants Dr. Michael Hakala, Corizon State Regional Medical Director Dr. Elizabeth Conley, Corizon Health Services Administrator at SECC Phyllis Stanley, and Corizon, Inc. related to the treatment of those diseases, claiming that the defendants violated his Eighth Amendment right to be free from cruel and unusual punishment. This Court appointed counsel to represent plaintiff. Defendants have moved for summary judgment (#149). For the reasons explained below, summary judgment will be granted to defendants.

## I.    Factual Background

The following facts are undisputed unless otherwise indicated. Plaintiff became an inmate with the Missouri Department of Corrections ("MDOC") in 1996. MDOC contracts with Corizon, Inc. to provide medical services to inmates. In 2006, while incarcerated at Crossroads Correctional Center, plaintiff was diagnosed with polycystic kidney disease ("PKD") and polycystic liver disease ("PLD"). At the time, plaintiff had

1

been scheduled for hernia surgery, but the surgery was cancelled due to elevated blood pressure and an abnormal EKG. Plaintiff underwent a pre-operative renal Doppler ultrasound on April 7, 2006, which suggested the presence of the polycystic kidneys. In May 2006, plaintiff underwent a CT arteriogram, which revealed non-cancerous polycystic kidneys. Plaintiff's treating physician at the time, a nonparty, discussed with plaintiff the results and PKD, including the possibility of kidney failure.

Plaintiff had the hernia surgery and a liver biopsy in June 2006. The hospital records state that "we are considering outpatient nephrology consultation and hepatology/gastroenterology consultation as well to follow up these conditions" and that a "Dr. Matthews . . . is willing to go ahead and follow carefully" with outpatient follow-up.

On July 31, 2006, plaintiff met with the prison physician, nonparty Dr. Gallup, who was concerned by plaintiff's GGT and creatinine levels were elevated. Dr. Gallup also noted surgeon Dr. Barton's recommendation for baseline laboratory testing along with ultrasound of liver. Although Dr. Gallup made a referral request to a renal specialist, it is unclear whether the request was withdrawn or denied.

In November 2006, plaintiff's treating physician talked to plaintiff about the disease progression in general and informed plaintiff there was no need for a specialist unless his condition worsened. Instead, treatment for PKD includes treating the complications of the disease, including hypertension, renal insufficiency, hematuria, kidney stones, or renal infection. Monitoring kidney function consists of monitoring the glomerular filtration rate ("GFR") and urine for signs of infection and hydration. Treatment of PLD also consists of monitoring liver function with liver function testing, lab work, and ultrasounds. Specifically, blood work to monitor liver function would

include the testing of liver enzymes and other markers.  Treatment of PKD and PLD might also include decompression of the cysts, which requires a surgical consultation.

Plaintiff was transferred to Southeastern Correctional Center ("SECC") and placed under the care of defendant Dr. Hakala in January 2009.  By that point, plaintiff's lab results showed that his creatinine levels rose and GFR dropped as follows:

|  | Creatinine | GFR |
|---|---|---|
| April 2008 | 1.6H | 49.28 |
| August 2008 | 1.7H | 42.59 |
| January 2009 | 1.8H | 39.84 |

Creatinine level of 2.0 is indicative of renal failure.  GFR indicates how well the kidneys are functioning.  Dr. Hakala testified that GFR below 60 indicates cause for concern:  "I may still monitor him for another six months or I might decide well, now we should have a consult and see what the opinion of a renal specialist would be. Most often I would do that, particularly for blood pressure control, too."  (Hakala Dep. at 56.)  Corizon policy documents also show that a renal consult should be considered when an inmate has a GFR of 39-50.

Plaintiff contends that although his medical condition required close monitoring of his bloodwork, lab testing was not completed as ordered, lab results were not reviewed and/or acted upon, and complete lab testing to check for liver enzymes were not conducted.  For example, in March 2009, nonparty Dr. Babich ordered labs to be taken the same month, but they were not.  Plaintiff says that although a basic metabolic panel was completed on August 7, 2009, no follow-up of the labs and no liver enzymes test was completed.  The August 7 results were as follows:

|  | Creatinine | GFR |
|---|---|---|
| August 2009 | 1.9 | 37 |

Those results thus showed that plaintiff's kidney function was continuing to decline.

On September 29, 2009, plaintiff saw nonparty Dr. Flood for a Chronic Care Clinic visit. Dr. Flood reviewed plaintiff's worsening lab results and diagnosed him with chronic renal failure. Dr. Flood instructed plaintiff to stop taking Naproxen for pain and replace it with Tylenol because the Naproxen can adversely affect his kidneys in light of the PKD diagnosis.

Plaintiff saw defendant Dr. Hakala on January 14, 2010. Although basic vital signs were taken according to the medical record (CORIZON 722), the record does not indicate Hakala reviewed or discussed plaintiff's most recent lab results.

Plaintiff submitted an Medical Services Request ("MSR") on January 21, 2010 regarding a lump or cyst in or on his stomach. CORIZON 725. He was seen by a nurse on January 22, who noted that Coleman expressed pain when his stomach was touched, and Coleman said it hurt when he lies on top of his stomach. The notes say that Dr. Matthews issued a verbal order for plaintiff to see Hakala on Monday, January 25. However, Hakala did not see plaintiff again until March 17. Defendants appear to dispute that the "verbal order" was directed at Hakala; instead, they say the order was directed at plaintiff. At the same time, they state that the "nurse or appointment scheduler is responsible for scheduling physician appointments." (*See* #168 at ¶ 57.) Plaintiff had bloodwork again on January 26:

|  | **Creatinine** | **GFR** |
|---|---|---|
| January 2010 | 1.8 | 40 |

His liver enzymes were not tested.

On February 3, 2010, plaintiff had still not seen Dr. Hakala, so he filed another MSR to be seen regarding the lump in his stomach. Plaintiff was seen by a nurse on

February 4, and she noted that plaintiff's upper right quadrant was swollen, hard, and very tender to the touch, that the "knot" is approximately eight inches in diameter, and that plaintiff has pain when he sleeps on his right side. The nurse referred plaintiff to a doctor. Plaintiff then saw Dr. Flood on February 8. Flood noted that plaintiff's symptoms had grown progressively worse over the past three years and wrote plaintiff's abdomen was "grossly distended" and there was a "risk of colangio carcinoma." (CORIZON 730-31.) Dr. Flood's plan was to order an ultrasound of the liver, order labs, and refer plaintiff for surgical evaluation/treatment. The plan further referred to Dr. Barton's June 21, 2006 report and stated "the dx of polycystic liver disease carries a risk of colangio carcinoma and recommends yr'ly surveillance w/liver u/s, afp, cea and lfts."

Dr. Flood made a referral request for a liver ultrasound for plaintiff, and that request was approved. Plaintiff's February 18, 2010 lab work showed the following results:

|  | **Creatinine** | **GFR** |
|---|---|---|
| February 2010 | 1.7 | 42 |

The results of the ultrasound indicated on February 25, 2010 that plaintiff's liver and kidneys were "heavily involved by numerous small and large cysts," that the gallbladder was obscured by cysts, and a CT scan was recommended. Dr. Flood testified that based on plaintiff's history and the ultrasound, a CT would have been appropriate.

Plaintiff filed an MSR for a follow-up of the ultrasound results on March 15, 2010 and met with a nurse the same day. The nurse's plan was to refer plaintiff to see a doctor, and plaintiff was assessed by Dr. Cooper on March 22, 2010, but Dr. Cooper did not discuss the ultrasound results with him.

Plaintiff filed MSRs on March 18, April 14, 26, 27, and 28 regarding the pain in his abdomen.  Defendant Hakala reviewed plaintiff's file on April 18 but made no contact with him until April 29, when Hakala reviewed the February 25 ultrasound results. Hakala wrote in the medical record that he planned to request a CT of plaintiff's abdomen to check for hernia and to see Coleman's gallbladder better.  Hakala also noted during plaintiff's April 29 Chronic Care Clinic visit that plaintiff had chronic renal failure.

Hakala's referral request was approved.  Plaintiff's May 7, 2010 CT scan report noted that plaintiff's liver was 80% full of cysts and that the enlarged liver occupied most of plaintiff's upper abdomen.  The report was provided to Hakala on May 17.

Plaintiff submitted an MSR on May 25 for abdominal pain, and a nurse gave him Tylenol.  On May 26, he filed an MSR seeking to learn the results of his CT scan. Plaintiff met with Hakala on June 1.  Hakala's notes in the medical record continue to focus on plaintiff's 2006 hernia repair and the CT report's failure to mention any hernia, and Hakala requested a re-read of the CT scan.  On June 3, the requested re-read produced the same report with a recommendation for a follow-up exam in a few months for further evaluation.

Plaintiff filed another MSR for stomach pain on June 15.  Although a nurse made a plan for "referral to physician," plaintiff states there is no clear policy as to how, when, or if the appointment should be made, nor is there a review procedure to ensure the plan was implemented.  Plaintiff did not see a doctor until he saw defendant Hakala on August 26.  Defendants dispute the suggestion that plaintiff was referred specifically to Dr. Hakala, but defendants do not appear to refute that plaintiff did not see a doctor for more than two months after making the request.   Notably, as discussed below, plaintiff appears

to have seen Dr. Hakala in the Chronic Care Clinic on July 8, but plaintiff says Hakala did not address the re-read of the CT or the cysts, pain, or weight loss for which physician referrals were made.

On June 29, 2010, plaintiff filed another MSR for worsening pain and weight loss. He saw a nurse, and the plan was to "discuss with chronic care nurse/Dr. Hakala." (CORIZON 758.)  Plaintiff's July 30 lab work showed the following:

|           | Creatinine | GFR |
|-----------|------------|-----|
| July 2010 | 1.6        | 45  |

Although those creatinine and GFR numbers were improvements over earlier lab work, Hakala stated in his deposition that the labs were beginning to look interesting.  Hakala met with plaintiff on August 26, but nothing changed regarding Hakala's plan of treatment, and the re-read of the CT results was not discussed with plaintiff.  The defendants dispute that the CT results were not reviewed with plaintiff.

Plaintiff filed another MSR regarding his kidney function and enlarged liver on October 18, 2010 and saw Dr. Hakala on October 22.  Dr. Hakala's plan was to wait to receive lab results in early 2011 and then consider a repeat CT or ultrasound.

Plaintiff's November 17, 2010 labs were as follows:

|               | Creatinine | GFR |
|---------------|------------|-----|
| November 2010 | 1.9        | 38  |

Plaintiff was seen by Dr. Flood for a Chronic Care visit on December 13, 2010, and Dr. Flood noted that plaintiff's creatinine had worsened since his last Chronic Care visit. Plaintiff's February 23, 2010 labs were as follows:

|               | Creatinine | GFR |
|---------------|------------|-----|
| February 2011 | 1.9        | 37  |

Plaintiff saw Dr. Hakala in Chronic Care Clinic on March 3, and Hakala noted that plaintiff's condition was worsening in light of the rising creatinine and falling GFR. Hakala then made a referral request for a renal pathologist, Dr. Winklemeyer.

Dr. Winklemeyer examined plaintiff on April 12, 2011 and assessed stage II chronic kidney disease, polycystic kidney disease, hypertension, and elevated coronary vascular risk. He recommended, among other things, additional lab work in July 2011 and follow-up appointments. However, Dr. Winklemeyer made no changes to plaintiff's course of treatment.

Plaintiff filed an MSR on April 18 to see a liver specialist. The plan entered by the nurse was to await follow-up with the site doctor. Plaintiff asserts no follow-up occurred, but defendants dispute that there was no follow-up. Defendants do not, however, cite to any evidence showing that there was follow-up.

On April 27, plaintiff filed an MSR because he felt his blood pressure was too high --- he was experiencing blurred vision, dizziness, and a headache. The nurse noted his blood pressure was elevated at 164/108. Plaintiff informed the nurse he had been out of his Nifedpine for five days and that the order was expired. Medications were re-ordered.

May 25 and July 1, 2011 labs were as follows:

|          | Creatinine | GFR |
|----------|------------|-----|
| May 2011 | 1.7        | 42  |
| July 2011| 2.0        | 35  |

Plaintiff had an appointment with defendant Hakala on July 7 concerning medication and lab results. Hakala's assessment was "hypertension, renal insuff." and his plan was to order a basic metabolic panel for August and follow-up in the Chronic Care Clinic.

Plaintiff points out that Hakala did not order liver enzyme testing, but defendants deny --- without citation to evidence --- that it was not ordered or that it was necessary.

On August 10, 2011, plaintiff filed an MSR at 10:29am for a medication problem and then a second MSR at 11:33 for a self-declared emergency because he had been out of medications, including blood pressure medications, for a week. He was suffering from a severe headache as a result.

Plaintiff's August 26, 2011 lab results were as follows:

|  | **Creatinine** | **GFR** |
| --- | --- | --- |
| August 2011 | 1.9 | 37 |

Again, plaintiff points out that Hakala did not order liver enzyme testing, but defendants deny --- without citation to evidence --- that it was not ordered and that it was necessary.

Dr. Winklemeyer again assessed plaintiff regarding his kidney function and blood pressure on September 6, 2011. Winklemeyer stated that "he has been doing okay" although "he does have some difficulty with abdominal discomfort because of the huge size of his cyst in his liver and kidneys." (CORIZON 2583.) Winklemeyer stated that plaintiff should "continue current medical regimen" and get labs in February 2012.

Plaintiff's October 2011 lab results were the same as the August results. The parties dispute the same issue regarding testing of liver enzymes discussed above.

On January 16 and 23, 2012, plaintiff filed an MSR for stomach pain. During the January 16 nurse visit, he reported pain in his liver and asked to see a liver specialist. There was no referral to a physician. During the January 23 nurse visit, plaintiff stated his stomach swelling was worse and waking him up. The nurse noted that plaintiff's abdomen was firm with several hard knots in it. Plaintiff says no referral to a physician

was made, but defendants point out that the plan of care was to refer plaintiff to DSC, or "doctor sick call." (CORIZON 845-46.)

Plaintiff was seen in the Chronic Care Clinic on January 28, 2012. The doctor who saw plaintiff ordered an appointment with Dr. Hakala so he could consider a repeat CT and ultrasound. Hakala saw plaintiff on February 3, made no reference to the clinic doctor's CT and ultrasound suggestions, and planned for plaintiff to follow up in Chronic Care Clinics. Plaintiff's February 24 labs were as follows:

|  | Creatinine | GFR |
|---|---|---|
| February 2012 | 1.69 | 42 |

Plaintiff's sister contacted Corizon regarding plaintiff's complaints of stomach pain on February 27, 2012. On February 28, plaintiff filed another MSR for stomach pain and told Hakala on March 1 that he had "stomach pain all over most of [the] time." Plaintiff had protein in his urine, and Hakala assessed him as having a "massive liver." Hakala's plan was to order a CT so he could compare the results to the 2010 CT. (CORIZON 856.) Hakala ordered the CT, but his request was denied by the regional medical director. Plaintiff also saw renal specialist Dr. Winklemeyer on March 1. Winklemeyer noted that plaintiff was "quite symptomatic," that the liver cysts were compressing his GI tract and causing weight loss. Winklemeyer discussed options with plaintiff including laparoscopic debulking of his liver and resecting the lobe of his liver. But Winklemeyer also noted that his surgical suggestions were "questionable" and "may or may not work."

On five days in April 2012 --- April 5, 12, 18, 20, and 26 --- plaintiff filed MSRs for stomach pain. He was seen by Dr. Hakala on April 27, who continued to prescribe Tylenol and referred plaintiff to nonparty Dr. Doerhoff for a surgical consult. Dr.

Doerhoff reviewed plaintiff's medical records and imaging on May 16, 2012. Doerhoff noted that there was not much room for the bowels according to the CT scan.

Plaintiff filed additional MSRs for stomach pain on May 14 and 29 and June 5 and 6, 2012. He told the nurse on June 7 that he is in pain all of the time. He filed more MSRs for stomach pain on June 15 and 29, and July 11 and 23. Plaintiff saw a nurse regarding those MSRs in June, but he did not see a physician until August 8. Although the medical record suggests that Hakala reviewed Dr. Doerhoff's May 16 report on May 23, Hakala writes in the August 8 encounter that "Dr. Doerhoff was going to ask a colleague about the CT." A September 13 update reports that Dr. Doerhoff learned from Dr. Howard that no surgical options were available to plaintiff and that "renal failure is eminent" [*sic*]; Hakala also mentions the possibility of dialysis, and that plaintiff "needs to think about his code status." (CORIZON 880.) On September 19, 2012, Hakala met with plaintiff and told him that his condition was progressive and would lead to dialysis and that the surgeons did not consider him a surgical candidate.

Plaintiff filed more MSRs for stomach pain on September 19, October 8, and October 31. Plaintiff was seen in the Chronic Care Clinic on November 8 by nonparty Dr. Myers. She observed his abdominal problems and wrote that plaintiff "needs ultrasound of abdomen asap" but then wrote "ultrasound of abdomen not ordered as I was unaware it was a referral." She stated that plaintiff "needs to f/u with Dr. Hakala due to long hx with abd. problems." She also said he should go to Chronic Care Clinic in one month or sooner if needed.

Plaintiff filed an MSR on November 27, 2012 because he was out of one of his blood pressure medications. He filed MSRs on November 28 and December 5 due to abdominal pain and saw Dr. Hakala on December 6, 2012 due to his complaints of

swelling abdomen and shortness of breath.  Plaintiff reported that he could not sleep due to the pain.  Dr. Hakala noted that plaintiff had "very little space for diaph[ragm] motion."  (CORIZON 900.)  Hakala stated that he would request a consult with Dr. Winklemeyer regarding the need for dialysis and request a repeat CT.  The December 27 CT scan showed "severe polycystic kidney disease with extensive heptatic involvement which appears to have progressed."  (CORIZON 902.)  The report also suggested magnetic resonance angiography to evaluate for the presence of a cerebral aneurysm.  Hakala does not appear to have ordered any follow-up testing, treatment, or consultation.

On January 23, 2013, Dr. Hakala noted that "Tylenol is handling pain" and that some days plaintiff would take one Tylenol pill per day and other times eight pills per day for it.  (CORIZON 915.)

On February 15, 2013, plaintiff filed an MSR for stomach pain and told the nurse that he cannot eat much due to the pain.  His girth was measured as 44 inches.  On March 8, plaintiff's family member called out of concern for plaintiff's pain and abdominal swelling.  Nonparty Stephanie Novak took the call and told the family member she would have plaintiff evaluated, but the parties dispute whether any evaluation took place.

Plaintiff had a Chronic Care Clinic appointment on July 18, 2013, which plaintiff says was the first chronic care appointment since November 8, when Dr. Myers said he should be seen the next month.  Dr. Hakala noted plaintiff's abdomen was tense and measured 44 inches, and Hakala's plan was to complete metabolic panels every six months and follow up with Dr. Winklemeyer.

Plaintiff's labs continued to show poor kidney function.  On August 29 they showed the following:

|  | **Creatinine** | **GFR** |
|---|---|---|
| August 2013 | 1.99 | 35 |

Per Dr. Winklemeyer's recommendation following a September 16, 2013 visit, Hakala discontinued Captopril and started plaintiff on Enalapril. Plaintiff was seen in the Chronic Care Clinic on October 11. On November 1, Hakala made a referral request for follow-up consult with Dr. Winklemeyer in May 2014, and the referral was approved. In November 2013, however, plaintiff complained about side effects from the new blood pressure medication, Enalapril. It appears from the medical record that plaintiff wanted to go back to the Captopril, but that Hakala wanted plaintiff to continue to take Enalapril per Dr. Winklemeyer's recommendation. Plaintiff refused to take the Enalapril as a result.

On December 18, 2013, plaintiff saw the nurse for a painful knot on his left side and wheezing when he breathed. Dr. Beth Hakala, a nonparty, made a referral request for a CT because she believed the mass may be a new cyst on plaintiff's spleen. The request was approved, and a January 15, 2014 CT revealed massive hepatomegaly with liver replaced by multiple cysts, polycystic kidneys on both sides, and elevation of the right diaphragm.

Plaintiff's February 4, 2014 labs showed creatinine levels were as follows:

|  | **Creatinine** | **GFR** |
|---|---|---|
| February 2014 | 2.04 | Not observed |

Plaintiff also filed an MSR on February 4 for chest pain. He also told the nurse that he was out of his blood pressure medication --- it is unclear, however, what blood pressure medication he was taking at this point. It does appear that Dr. Winklemeyer resumed

plaintiff on Captopril instead of Enalapril in February 2014. Plaintiff's March and April labs were as follows:

|  | Creatinine | GFR |
|---|---|---|
| March 2014 | 2.19 | 31 |
| April 2014 | 2.04 | 34 |

On April 30, 2014, nonparty Dr. Massey submitted a referral request for a follow-up surgical consult with Dr. Doerhoff to see whether therapeutic drainage of the cysts for comfort was possible, but the referral was deferred because plaintiff's cysts would recur, and he was at high risk for complications. Plaintiff was also prescribed Neurontin for chronic pain.

By October 29, 2014, plaintiff's labs continued to show poor kidney function, and his abdomen had grown to 46".

On March 18, 2016, plaintiff was taken out of SECC on a stretcher and transported to Missouri Delta Medical Center due to shortness of breath and pain. He was at some point transferred to Washington University, and his condition had progressed to the point where he could not lie down flat for a CT scan. His labs at that time were as follows:

|  | Creatinine | GFR |
|---|---|---|
| March 2016 | 4.2 | 19 |

On April 11, 2016, plaintiff presented to Barnes Jewish Hospital for emergency care. A chest x-ray revealed an elevated right diaphragm and almost complete hepatic and renal replacement by extensive cysts. The surgeon who examined plaintiff stated "I don't think this is a surgically fixable problem" and only a liver and kidney transplant could reverse the course of his disease, but he was not sick enough for emergency transplant status. It was recommended that plaintiff begin hospice care.

In addition to the above-stated facts regarding plaintiff's PKD and PLD, plaintiff alleges the defendants allowed his blood pressure medication to run out and that he filed MSRs for blood pressure checks that he suggests were not responded to. Defendants note that monthly blood pressure checks were ordered by the medical provider through the cardiovascular Chronic Care Clinic. Defendants appear to accurately portray plaintiff's blood pressure check regularity, and plaintiff does not appear to press that his deliberate indifference claim includes a failure to monitor his blood pressure. (*See, e.g.*, #168 at ¶ 108.) As for plaintiff's blood pressure medication, it does appear that plaintiff periodically went without blood pressure medication, but those lapses were remedied.

Plaintiff filed his complaint on April 17, 2013. Counsel was appointed for plaintiff on May 2, 2014. Plaintiff's amended complaint alleges that the defendants were deliberately indifferent to plaintiff's serious medical needs in violation of his constitutional rights. The four defendants, Dr. Michael Hakala, Corizon State Regional Medical Director Dr. Elizabeth Conley, Corizon Health Services Administrator at SECC Phyllis Stanley, and Corizon, have moved for summary judgment.

## II. Legal Standard

Pursuant to Federal Rule of Civil Procedure 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467 (1962). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Assoc. Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir. 1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976).

## III. Discussion

Defendants seek summary judgment on each count against them.

### A. Defendant Dr. Michael Hakala

Defendant Dr. Michael Hakala provided medical care to plaintiff at SECC and was employed as an independent contractor physician for Corizon. Plaintiff claims defendant Hakala violated his Eighth Amendment right to be free from cruel and unusual punishment by failing properly to treat his PKD and PLD. To establish a constitutional violation based on inadequate medical care, plaintiff must show defendant was deliberately indifferent to the plaintiff's serious medical needs. *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009). "Deliberate indifference has both an objective and a subjective component." *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006). The objective component requires a plaintiff to demonstrate an objectively serious medical need. *Grayson v. Ross*, 454 F.3d 802, 808-09 (8th Cir. 2006). A "serious medical need" is one "that has been diagnosed by a physician as requiring treatment or one that is so

obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Coleman v. Rahija*, 114 F.3d. 778, 784 (8th Cir. 1997) (quoting *Camberos v. Branstad*, 73 F.3d. 174, 176 (8th Cir. 1995)).

In order to satisfy the subjective component of an Eighth Amendment medical claim, a plaintiff inmate must show that the prison officials knew of, yet deliberately disregarded, an excessive risk to the inmate's health. *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997). A prison official may be liable under the Eighth Amendment if he knows that an inmate faces a substantial risk of serious harm and fails "to take reasonable measures to abate it." *Coleman*, 114 F.3d. at 785 (citing *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)). The plaintiff must establish a "mental state akin to criminal recklessness." *Vaughn*, 557 F.3d at 908 (quoting *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006). "Neither differences of opinion nor medical malpractice state an actionable Constitutional violation." *Jones v. Norris*, 310 F.3d 610, 612 (8th Cir. 2002).

Defendants contend that, although there is no doubt that plaintiff's PKD, PLD, renal failure, and hypertension are serious medical conditions, Hakala regularly and appropriately monitored and treated the symptoms of plaintiff's conditions. The record shows, for instance, that Hakala and staff monitored plaintiff's polycystic kidney and liver disease progression through regular lab work, an ultrasound in 2010, CT scans in 2010, 2012, and 2014, and visits with specialists starting in 2011.

Plaintiff retorts that Hakala, when he took over management of plaintiff's condition in 2009, should have ordered yearly ultrasounds according to the deposition testimony of another treating physician, Dr. Jared Flood. In addition, plaintiff points out that his GFR levels were consistently well under 60, which Hakala himself said would call for a renal specialist consult. Hakala also testified that he believed a GGTP (which

pertains to plaintiff's liver function) should be obtained each time labs were taken for plaintiff, but GGTP was infrequently obtained. Furthermore, by no later than early 2010, one of plaintiff's cysts was visibly protruding from his upper abdomen --- a symptom that caused Dr. Flood to order an ultrasound. Although that ultrasound was approved, Dr. Hakala did not review the results --- which called for a CT scan --- for more than two months. Even when Dr. Hakala finally ordered the CT scan in April 2010, Dr. Hakala inexplicably focused on the scan's failure to reveal a hernia rather than on the severe polycystic kidney and liver problems it did reveal. Then, Dr. Hakala did not refer plaintiff to a renal specialist until March 2011. Plaintiff saw that renal specialist, Dr. Winklemeyer, three times until plaintiff's continued complaints of pain resulted in Hakala's referring plaintiff to a surgeon. That surgeon, Dr. Doerhoff, said that nothing could be done about plaintiff's cysts. Visits to different surgeons two years later resulted in the same diagnosis. As plaintiff had been informed numerous times, PKD and PLD are progressive diseases, and he would ultimately require dialysis as part of his treatment.

Although plaintiff's experience certainly does not present a model of medical care, the Court holds that Hakala's delay in referring plaintiff to a specialist, his infrequent ordering of diagnostic imaging, his perplexing fixation on a nonexistent hernia diagnosis, and his failure to order more thorough lab tests does not rise to the level of deliberate indifference. When an inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, "the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment." *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir. 1995), abrogation on other grounds recognized by *Reece v. Groose*, 60 F.3d 487, 492 (8th Cir. 1995) (internal quotation omitted). It is perhaps troubling that there was no proactive investigation into addressing plaintiff's visible,

painful cysts when they were relatively small, but plaintiff's condition was not ignored, and even plaintiff's expert does not explain how, if at all, additional treatment would have helped. *See, e.g.*, *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997) (noting that inmate "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment."). And even though plaintiff would have preferred an earlier consult and more thorough lab work, prisoners "have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment." *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997).

Moreover, most damaging to plaintiff's case is that, when Dr. Hakala referred plaintiff to renal specialist Dr. Winklemeyer in 2011, that specialist did not prescribe a different course of action; instead, he stated that plaintiff should "continue current medical regimen." Plaintiff's suggestion that surgical discussions should have happened earlier is also belied by Dr. Winklemeyer's orders. Dr. Winklemeyer did not even discuss surgical possibilities until plaintiff's third visit with him, in 2012; Hakala then referred plaintiff to a surgeon (apparently in response to Winklemeyer's suggestion that surgery may or may not work), and that surgeon confirmed that surgery was not an option.

Plaintiff suggests that his facts implicate the Supreme Court's decision in *Estelle v. Gamble* because the defendants' failure to provide adequate medical care is causing plaintiff's "lingering death." 429 U.S. 97, 103 (1976). Although plaintiff's circumstances are indeed difficult, they are the products of the incurable diseases from which he suffers --- not the medical care he received while incarcerated. Plaintiff undoubtedly was and is a very ill man with a chronic and progressive illness. In light of

these circumstances, plaintiff was appointed counsel who has diligently advocated for her client. However, the unfortunate fact remains that there is no cure for PKD and PLD. Dr. Winklemeyer himself noted that decompressing the cysts "for comfort" was not an option because the cysts would just come right back; he also wrote that he was "not sure [plaintiff] understands this after several explanations." (#160-8 at 4.) Although plaintiff complains that his liver function was not regularly screened by lab work and that he was never referred to a liver specialist, Dr. Flood testified that referral to a specialist for liver issues may include referral to a surgeon and "not necessarily a liver specialist." (#160-1 at 37.) Further, there is no evidence that his liver function caused the suffering for which he complains or that it was not adequately addressed by visits regarding his abdominal cysts generally. Additionally, there is no evidence that plaintiff's occasional failure to receive his blood pressure medications was a factor in plaintiff's claimed injury, particularly in light of plaintiff's own reluctance to take his medications at times. In fact, Dr. Winklemeyer's reports consistently indicate that plaintiff's hypertension was well controlled.

The evidence also shows Dr. Hakala was not deliberately indifferent to plaintiff's pain. Plaintiff complained of severe pain for years and would at times between 2010 and 2012 file repeated MSRs. But he was provided with Tylenol, for which he had a monthly order and which he was allowed to keep on his person and take as needed for pain. Notably, as late as January 23, 2013, Dr. Hakala noted that "Tylenol is handling pain" and that some days plaintiff would take one Tylenol pill per day and other times eight pills per day for it. (CORIZON 915.) Plaintiff does not dispute that Tylenol was effective. Furthermore, despite seeing outside specialists beginning in 2011, those specialists did not adjust plaintiff's pain management. Finally, after plaintiff's

relationship with Dr. Hakala ended, on April 30, 2014, it is noteworthy that another doctor prescribed plaintiff Neurontin/Gabapentin for pain, but plaintiff did not like that medication because it made him sleepy. The medication was discontinued as a result.

The record shows that plaintiff's pain was known to defendant Hakala, but it is undisputed that pain is a known symptom of plaintiff's condition and that Tylenol controlled the pain --- in fact, the Tylenol was apparently preferable to the Neurontin that another physician later prescribed. Dr. Hakala provided plaintiff with Tylenol, which plaintiff admits was effective, and plaintiff does not point to any evidence that he was forced to be without Tylenol for any period of time.

Because the record shows defendant Hakala was not deliberately indifferent to plaintiff's serious medical condition, the Court will grant defendant Dr. Hakala's motion for summary judgment.

### B.     Defendants Dr. Elizabeth Conley and Phyllis Stanley

Plaintiff alleges that defendants Conley and Stanley acted with deliberate indifference when they failed to take action regarding grievances he filed concerning the continued denial of his blood pressure medication. Defendants Conley and Stanley were involved in three grievance appeal responses (the third and final step in the grievance process): those grievances are identified as SECC 10-1057, SEC 10-2044, and SECC 10-2117. For SECC 10-1057, plaintiff complained he had run out of medication in May 2010. Staff had apologized for the delay and instructed him to submit an MSR when his medication was running low; further, site management had said it would implement steps to prevent lapses in the future. By the time plaintiff's grievance reached defendants Conley and Stanley in December 2010, the matter had been resolved, and they

determined that no further action was required.  Plaintiff does not dispute that fact (#151 and #167 at ¶ 163).

Grievances SECC 10-2044 and SECC 10-2117 are nearly identical and were submitted within days of one another, in December 2010.  The grievances stemmed from plaintiff's complaints that he was unable to see a specialist for his kidneys or liver.  By the time defendants Conley and Stanley responded to the grievance appeals in March 2011, plaintiff had seen a specialist.  Plaintiff does not dispute those facts (#151 and #167 at ¶¶ 163, 166).

Instead, plaintiff suggests in his response memorandum that defendants Conley and Stanley, had they reviewed plaintiff's medical history, would have learned that Hakala's referral to a specialist was untimely and that he needed a liver specialist, not just a nephrologist.  In that way, plaintiff says, defendants Conley and Stanley were deliberately indifferent to plaintiff's serious medical needs.  This Court has already determined that plaintiff's PKD and PLD treatment was not constitutionally deficient.  Defendants Conley and Stanley will be granted summary judgment.

### C.    Defendant Corizon

Defendant Corizon contracts with the Missouri Department of Corrections to furnish medical care to MDOC prisoners.  A corporation acting under color state law may be liable under 42 U.S.C. § 1983 for its own unconstitutional policies or customs.  *See Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 690 (1978).  The "proper test is whether this is policy, custom, or action by those who represent official policy that inflicts injury actionable under Section 1983." *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975-76 (8th Cir. 1993).  Because the Court finds there is no underlying constitutional violation, however, Corizon is entitled to summary judgment.

Accordingly,

IT IS HEREBY ORDERED that defendants' motion for summary judgment
(#149) is GRANTED.


It is SO ORDERED this ___11th___ day of April, 2017.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE